1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| ROGER GLENN BINGLE, | ) | Case No.: 1:12-cv-01967 - JLT |
| Plaintiff, | ) ) | ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g) |
| v. | ) ) | |
| CAROLYN W. COLVIN, | ) ) | ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF ROGER BINGLE AND |
| Acting Commissioner of Social Security, | ) ) | AGAINST DEFENDANT CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL |
| Defendant. | ) ) | SECURITY |

Roger Glenn Bingle ("Plaintiff") asserts he is entitled to disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Therefore, Plaintiff seeks judicial review of the decision of the administrative law judge ("ALJ") who concluded he was not disabled. For the reasons set forth below, the action is **REMANDED** for further proceedings.

## PROCEDURAL HISTORY

On July 10, 2006, Plaintiff filed applications for disability insurance benefits and supplemental security income, alleging disability beginning December 1, 2005. (Doc. 10-6 at 2-11). The Social Security Administration denied Plaintiff's applications initially on November 8, 2006, and upon reconsideration on April 19, 2007 (Doc. 10-4 at 2-5). After requesting a hearing, Plaintiff testified before an ALJ on January 15, 2008. (Doc. 10-3 at 64). The ALJ determined Plaintiff was not disabled and issued an order denying benefits on June 11, 2008. (Doc. 10-4 at 12-20).

Plaintiff requested review of the ALJ's decision by the Appeals Council on June 20, 2008. (Doc. 10-5 at 32-33).  The Appeals Council granted Plaintiff's request on February 20, 2009, finding a remand for further proceedings was appropriate. (Doc. 10-4 at 21).  The Appeals Council directed the ALJ to contact Plaintiff's treating physician "to determine if he has additional documentation in support of his opinion;" obtain additional medical evidence "to clarify the nature and severity of [Plaintiff's] mental impairments;" address the relevant medical opinions, providing supporting rationale for the weight assigned to each opinion; and give "further consideration of the claimant's maximum residual functional capacity."  (*Id.* at 34-35).

A second hearing before the ALJ was held on June 9, 2011.  (Doc. 10-3 at 41).  Again, the ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying his applications for benefits on September 1, 2011.  (*Id.* at 17-33).  Plaintiff's request for review of the second decision was denied by the Appeals Council on October 2, 2012.  (*Id.* at 2-3). Thus, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

Plaintiff initiated this action for judicial review by filing a complaint on December 3, 2012. (Doc. 2).  He filed the opening brief on July 24, 2013, asserting the ALJ erred in her evaluation of the medical evidence, assessing the credibility of his subjective complaints, and rejecting the statements of lay witnesses. (Doc. 13).  Defendant filed a brief in opposition on August 26, 2013 (Doc. 14), to which Plaintiff replied on September 3, 2013.  (Doc. 15).

## **STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S.

389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920 (a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927, 416.929.

### A.    Relevant Medical Evidence

In April 2006, Dr. David Kerwin treated Plaintiff for intermittent back pain and his "legs going to sleep," which Plaintiff reported had occurred for the past four to five years.  (Doc. 10-8 at 4).  X-rays

of Plaintiff's lumbar spine interpreted by Dr. Iwamoto showed "mild levoscoliosis of the thoracolumbar junction." *Id.* at 5.  Dr. Iwamoto found "no evidence of spondylolysis or spondylolisthesis" and "no evidence of gross compression fractures or bony lesions." *Id.*  However, Dr. Iwamoto determined Plaintiff had "mild degenerative disc disease at the L5-S1 level," which "demonstrate[d] mild endplate sclerosis and osteophytosis." *Id.*  Dr. Kerwin prescribed Lortab for Plaintiff's pain.  In May 2006, Plaintiff complained of pain in his hips, reported he still had intermittent numbness in his back, and said his feet felt like "pins/ needles." *Id.* at 54.  In August 2006, Dr. Kerwin prescribed marijuana for Plaintiff's pain.  (Doc. 10-7 at 62; Doc. 10-8 at 54).

On October 19, 2006, Dr. Gurprett Dhaliwal performed electrodiagnostic studies upon the referral of Dr. Kerwin.  (Doc. 10-8 at 56-57).  Dr. Dhaliwal performed the testing "to check for [the] possibility of peripheral neuropathy or lumbosacral radiculopathy." *Id.* at 56.  Dr. Dhaliwal opined the study results were "normal… without any electrodiagnostic evidence of peripheral neuropathy, myopathy or lumbo-sacral radiculopathy bilaterally." *Id.* at 57.  However, Dr. Dhaliwal explained that the study did not "rule out underlying spinal stenosis." *Id.*

Dr. Jacklyn Chandler performed a consultative psychological evaluation on October 4, 2006.  (Doc. 10-8 at 6).  Plaintiff told Dr. Chandler that he was "able to do simple household chores such as washing dishes, doing laundry, and preparing simple meals." *Id.* at 7.  Dr. Chandler observed Plaintiff was "distractible" and he demonstrated "mildly to moderately decreased attention, concentration, and pace, which appeared to be due to his pain symptoms and physical discomfort." *Id.* at 7, 9.  After administering the Wechsler Adult Intelligence Scale, Dr. Chandler found Plaintiff had a Verbal IQ score of 81, Performance IQ score of 79, and Full Scale IQ score of 78, which indicated Plaintiff's "overall intellectual ability [was] within the low average to average range." *Id.* at 8.  Plaintiff's scores on the Wechsler Memory Scale-III "fell within the average range," and Dr. Chandler believed Plaintiff had "adequate memory functioning." *Id.*  Dr. Chandler concluded Plaintiff was able to remember and follow simple, complex, and detailed instructions. *Id.*

Dr. Jean Lee performed a neurological evaluation on October 22, 2006.  (Doc. 10-8 at 11).  Dr. Lee noted an x-ray of Plaintiff's lumbar spine "showed mild degenerative disc disease with associated osteoarthritic change at the L5-S1 level." *Id.* at 12.  Also, Plaintiff reported he had surgery for carpal

4

tunnel syndrome in 1998, though the symptoms returned a year later.  *Id.*  Plaintiff explained he had difficulty doing "heavy physical labor such as using hammers or power tools," but "no trouble holding a cup of coffee, opening a jar, or opening a doorknob."  *Id.*  Upon examination of Plaintiff's back, Dr. Lee found "a mild paraspinal muscle spasm" and "mild tenderness on palpation."  *Id.* at 14.  Dr. Lee determined Plaintiff's strength was 5/5 in both arms, "except his left pinch is slightly impaired at 4/5 compared to the right."  *Id.* at 15.  According to Dr. Lee, Plaintiff was able to sit without restriction and "could be expected to stand and walk…six hours allowing occasional breaks," but "allowing changes in postures and allowing period standing and walking around [was] suggested."  *Id.* at 15-16.  Further, Dr. Lee opined Plaintiff could lift and carry 10 pounds frequently and 20 pounds occasionally, and he had "no limits on reaching, handling, feeling, grasping, or fingering."  *Id.* at 16.  Dr. Lee recommended Plaintiff be limited to "occasional bending and crouching" because Plaintiff had decreased mobility in his left knee and bending would exacerbate his back pain.  *Id.* at 14, 61.

Dr. Lopez completed a physical residual functional capacity assessment on November 7, 2006. (Doc. 10-8 at 17-22).  Dr. Lopez opined Plaintiff was able to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an eight-hour day, and sit about six hours in an eight-hour day. *Id.* at 18.  However, Dr. Lopez indicated also that Plaintiff must periodically alternate sitting and standing to relieve his pain and discomfort.  *Id.*  Dr. Lopez determined Plaintiff was able to frequently balance, but was limited to occasional climbing, stooping, keeling, crouching, and crawling due to decreased range of motion and pain in his back and left knee.  *Id.* at 20.  Also, Plaintiff had an unlimited ability to reach, handle (gross manipulation), and finger (fine manipulation). *Id.*  Dr. Lopez found Plaintiff was limited to "occasional feeling due to impaired sensation."  *Id.*  Thus, Plaintiff was required to avoid concentrated exposure to, or frequent use of, vibratory tools.  *Id.* at 22.

In December 2006, Plaintiff reported he was unable to lift or bend, and told Dr. Kerwin his pain and stiffness had increased.  (Doc. 10-8 at 51).  *Id.*  Plaintiff informed Dr. Kerwin that marijuana "helps a lot."  *Id.*

On February 5, 2007, Plaintiff reported his right leg would go numb if he sat in one place.  *Id.* at 50.  Also, Dr. Kerwin treated Plaintiff for an increase of pain in his back and from his "butt to knee" on the right side.  *Id.*  Dr. Kerwin prescribed Valium and ordered an MRI of Plaintiff's lumbar spine.  *Id.*

5

The MRI showed there were "mild degenerative changes throughout the lumbar spine." *Id.* at 71. Specifically, Dr. Douglas found the L3-4 disc had "mild disc bulging in the neuro foramina bilaterally;" L4-5 had "minimal broad-based disc bulging minimally flattening the thecal sac with moderate left and mild right neural foraminal encroachment due to disc protrusion;" and the L5-S1 level had "mild discogenic disease with moderate posterocentral and mild right and left paracentral disc protrusion." *Id.* at 70-71.

In March 2007, Plaintiff was referred to Sports Medicine Clinic for treatment of his left elbow pain, which Plaintiff described as "a constant dull pain, and grade[d] it as an 8 out of 10 in intensity." (Doc. 10-8 at 95). His pain was "associated with numbness and tingling of his left hand and weakness" of his left arm. *Id.* Although Plaintiff requested an x-ray, he "decline[d] to receive any steroid injection for his left elbow pain." Dr. Jawaid found Plaintiff had a "full active range of motion" and his strength was 5/5. *Id.* The x-ray, taken per Plaintiff's request, was normal. *Id.* Dr. Jawaid prescribed a left wrist brace and recommended Plaintiff use ice on his elbow. *Id.*

Dr. Sharbaugh reviewed the record and "affirmed as written" the residual functional capacity assessment of Dr. Lopez on April 6, 2007. (Doc. 10-8 at 62).

Dr. Kerwin completed a physical capacities assessment on April 4, 2007. (Doc. 10-8 at 68-69). He opined Plaintiff was able to stand or walk 0-2 hours at one time and 2-4 hours total in an eight-hour day. *Id.* at 68. Dr. Kerwin stated Plaintiff was able to sit for 0-2 hours and "must move every 30 minutes or so." *Id.* According to Dr. Kerwin, Plaintiff was restricted from using his hands and fingers for repetitive motions due to carpal tunnel syndrome. *Id.* Dr. Kerwin believed Plaintiff was able to lift up to 20 pounds "in spurts," but could never lift 25 or more pounds. *Id.* at 69. Dr. Kerwin determined Plaintiff could occasionally balance and stoop, but could never climb, kneel, crouch, crawl, or reach below his knees. *Id.*

On August 14, 2007, Plaintiff was evaluated a neurosurgical clinic by Dr. Bairamian upon the request of Dr. Kerwin. (Doc. 10-8 at 74-75). Plaintiff reported his back pain was "aggravated by laying down." Dr. Bairamian determined that Plaintiff's senses were "normal to light touch and pin prick," but his reflexes were increased in his lower extremities. *Id.* at 75. Dr. Bairamian opined lumbar spine surgery was not warranted. *Id.*

6

Dr. Kerwin completed a second questionnaire regarding Plaintiff's impairments and limitations on May 23, 2007.  (Doc. 10-8 at 64-68).  He opined Plaintiff's medical impairments—including degenerative disc disease, foraminal encroachment and tennis elbow—precluded Plaintiff from any work, including at the sedentary exertion level.  *Id.* at 64.  He believed Plaintiff was able to sit for 0-4 hours in an eight-hour day, and he had "to get up every ½ hr."  *Id.*  Also, Dr. Kerwin opined Plaintiff was able to stand and/or walk 2-4 hours in an eight-hour day.  *Id.*  Dr. Kewrin noted Plaintiff had carpal tunnel syndrome in both hands, and believed Plaintiff could lift 10 pounds occasionally, and 10 pounds or less frequently.  *Id.* at 65.  Further, Dr. Kerwin opined Plaintiff could do "very little" reaching, handling, feeling, pushing, pulling or grasping, because Plaintiff dropped things.  *Id.*  He believed Plaintiff had been limited to this extent since August 2004.  *Id.*

In September 2008, Dr. Bairamian reevaluated Plaintiff.  (Doc. 10-8 at 87).  Dr. Bairamian observed that an MRI of Plaintiff's lumbar spine showed "degenerative changes at L5-S1," with "minimal central disc protrusion."  *Id.*  Again, he determined surgery was not warranted, and opined Plaintiff would "require conservative care."  *Id.*  Therefore, Dr. Bairamian referred Plaintiff to have a course of physical therapy.  *Id.*

Plaintiff had x-rays taken of his left wrist on March 24, 2009.  (Doc. 10-9 at 9).  Dr. Douglas Tait reviewed the x-rays and determined there was "no evidence of erosive changes" and "[n]o evidence of acute bony or gross soft tissues abnormality of the wrist joint."  *Id.*  X-rays of his cervical spine taken in November 2010, which showed "a very subtle scoliosis convex to the right" and "a straightening of the normal cervical lordosis."  *Id.* at 8.

On February 23, 2011, Dr. Dale Van Kirk performed a comprehensive orthopedic evaluation.  (Doc. 10-8 at 99-103).  Plaintiff's chief complaint was "low back pain which radiate[d] down both legs," and he reported also having "numbness in the arms, carpal tunnel syndrome, [and] migraine headaches." *Id.* at 99.  Plaintiff reported he was unable to "do any heavy yard work, vacuuming, mopping, or heavy household chores because his back will not tolerate it."  *Id.* at 100.  Dr. Van Kirk noted he reviewed an MRI from February 21, 2007, which showed "minimal broad base disk bulging, with moderate left and right neuroforaminal encroachment due to the disk protrusion of L5-S1" and "mild diskogenic disease with mild right and left paracentral disk protrusion."  *Id.* at 99.  Dr. Van Kirk

observed that Plaintiff walked with a "limp favoring the left lower extremity," but was able "to squat

down and take a few steps." *Id.* at 100. After testing Plaintiff's range of motion, Dr. Van Kirk opined

Plaintiff "should be able to stand and/or walk cumulative for six hours of an eight-hour workday" and

"sit cumulatively for six hours in an eight-hour workday." *Id.* at 102. He determined:

> The claimant should be able to lift and carry frequently 10 pounds and occasionally 20 pounds limited because of chronic low back pain with radiation down the legs bilaterally …. The claimant is limited to only occasional postural activities including bending, stooping, crouching, climbing, kneeling, balancing, crawling, pushing, or pulling because of significant low back pain with radiation down both legs.

*Id.* at 102. Because Plaintiff's symptoms were "enhanced with cold weather," Dr. Van Kirk found

Plaintiff "should not be required to work in a cold and/or damp environment." *Id.* at 103. Further, he

recommended Plaintiff "obtain and use a lumbosacral corset mainly when he is out and about for even

and uneven terrain." *Id.* at 102.

    In February 2011, Dr. Amanda Crews began treating Plaintiff for low back and left hip pain.

(Doc. 10-9 at 6). Plaintiff reported he took morphine and Lortab, but ran out of medication four months

prior to his appointment with Dr. Crews. *Id.* In March 2011, Dr. Crews ordered an EMG and nerve

conduction studies, which suggested "median nerve neuropathy at the wrist…consistent with moderate

carpal tunnel syndrome." *Id.* at 10-11.

    Dr. Crews completed a residual functional capacity questionnaire on May 19, 2011. (Doc. 10-8

at 124-25). She opined Plaintiff's impairments—including back pain with numbness in both legs, pain

in his hips, and weakness and pain in his arms—precluded him from performing any full-time work at

any exertion level. *Id.* at 124. Dr. Crews believed Plaintiff was able to sit for "2-3 hours total" in an

eight-hour day, and stand/walk for "2-3 hours total" in an eight-hour day. *Id.* She noted Plaintiff was

diagnosed with carpal tunnel syndrome in both hands, but his impairment was greater in his left arm.

*Id.* Dr. Crews opined Plaintiff could lift and carry 5-10 pounds frequently and 10 pounds occasionally

during a work day, but he was unable to reach, handle, feel, push, pull, or grasp. *Id.* at 125.

**B.    Administrative Hearing Testimony**

    1.    January 15, 2008

    Plaintiff testified he had an eighth-grade education and was "barely" able to read and write.

(Doc. 10-3 at 67). He reported he did not have any additional education or work training, and was

unable to remember the last job he held.  *Id.*  However, Plaintiff believed he was unable to return to working any of his past jobs because of numbness in his legs, back and hands.  *Id.* at 68.  He stated he had constant pain due to degenerative disc disease in his back and carpal tunnel syndrome in both hands which precluded him from working.  *Id.*  Plaintiff reported he stopped working because he was unable to "perform the job by lifting things and carrying stuff."  *Id.* at 67.

Plaintiff explained that his legs were "totally asleep" and he had constant "shooting pains" from the back of his legs to the back of his knees.  (Doc. 10-3 at 69).  In addition, Plaintiff stated he was "constantly dropping stuff" or unable to pick up items due to the numbness in his hands.  *Id.* He said he had tendinitis in his left elbow, which he said "creaks" when bent.  *Id.* at 70.  Plaintiff explained that his pain increased with stooping and bending over.  *Id.*  Plaintiff said he elevated his legs to relieve the pain, and he would do so "[a]bout three times a day," for "30 to 45 minutes at a time."  *Id.* at 71.  In addition, he reported that he would lie down "three to four times a day" for "30 to 45 minutes."  *Id.*

He estimated he was able to lift "eight to 10 pounds" with either his left or right arm.  (Doc. 10-3 at 70).  Plaintiff believed he was able to sit for "about five to 10 minutes" at one time, and be on his feet for "10 to 15 minutes" at one time.  *Id.* at 72.  He stated he was able to use his hands for "five to 10 minutes" before he had to stop and rest for 20 minutes.  *Id.*  Plaintiff reported he had difficulty with repetitive reaching, and was only able to do so for "five to 10 minutes."  *Id.*

Further, Plaintiff reported he suffered from depression and anxiety problems.  (Doc. 10-3 at 73). He said he was easily stressed out and had difficulty concentrating.  *Id.*  Plaintiff estimated he could focus for approximately ten or fifteen minutes, and he believed he was unable to work due to his loss of concentration.  *Id.*  According to Plaintiff, he slept only three to four hours a night and napped during the day because he "felt like [he] never even slept" when he awoke in the morning.  *Id.* at 75.

Vocational expert David Dettmer testified at the hearing and identified Plaintiff's past relevant work as a home health aide, *DOT*[1] 354.377-014; roofer, *DOT* 688.381-010; and chrome polisher, *DOT* 705.684-062.  (Doc. 10-3 at 76-77).  The ALJ asked Mr. Dettmer to consider an individual "the same

---

[1] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990).  The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner.  20 C.F.R. § 404.1566(d)(1).

age, education, and work experience as the claimant," who "could occasionally lift 20 pounds/frequently 10; stand or sit six hours in an eight-hour day, but must periodically alternate sitting and standing to relieve pain and discomfort." *Id.* at 77. Further, the individual was able to "occasionally climb, stoop, kneel, crouch and crawl;" could "do occasional feeling due to impaired sensation to light touch and two-point discrimination in the bilateral upper extremities;" had "limited reaching, handling, or fingering;" and was required to "avoid concentrated exposure to vibration." *Id.* at 77-78. Mr. Dettmer opined such a person was unable to perform Plaintiff's past relevant work. *Id.* at 78. However, he believed the person could perform "a light job periodically alternating between sitting and standing," such as a cashier, *DOT* 211. 462-010; office helper, *DOT* 239.567-010; and a parking lot attendant, *DOT* 915.473-010. *Id.* at 78-79.

Next, Plaintiff's counsel questioned Mr. Dettmer based upon the limitations Plaintiff explained at the hearing. (Doc. 10-3 at 79-80). Mr. Dettmer considered whether the jobs identified would "allow the person to be able to elevate his or her feet…about three times a day for 30 to 40 minutes" each time. *Id.* at 79. He explained: "If that was three times during a work shift," the person could not perform the work, but "[i]f that was three times a day and only one occurred during the work shift, then that [limitation] could be accommodated at lunch." *Id.* Further, Mr. Dettmer opined the worker was able to perform the work of a cashier, office helper, and parking lot attendant if he was "only able to lift about eight to 10 pounds," although the number of cashier jobs would be "eroded… a bit." *Id.* at 80.

## 2.    June 9, 2011

Plaintiff testified before a different ALJ after the matter was remanded by the Appeals Council. He reported he went through the eleventh grade in school, and had been in special education classes. (Doc. 10-3 at 43). Plaintiff stated he was unable to read a newspaper, and had not been able to read the notice of hearing. *Id.* However, he was able to "do simple adding and subtracting." *Id.* Plaintiff said that he fell off a roof while helping a friend, which rendered him unable to work. *Id.* at 44.

He reported he suffered from arthritis, carpal tunnel syndrome, mental problems, difficulty sleeping, a loss of appetite, and pain in his legs. (Doc. 10-3 at 44, 47-48). Plaintiff reported he saw a doctor "once every two months." *Id.* at 48. He confirmed he was taking Lexapro, Lortab, morphine, and Soma, and said he did not have any side effects from these medications. *Id.*

Plaintiffs testified he was able to dress and bathe without assistance; performed household chores including cooking, washing dishes, mopping, sweeping, doing laundry, yard work, and gardening.  (Doc. 10-3 at 45-46).  Plaintiff said he watched television about four to six hours a day, and did not exercise.  *Id.* at 46.  He testified that he was able to drive, but after about thirty minutes he would be "hurting pretty bad."  *Id.* at 47.  Plaintiff estimated he was able to lift about 10 pounds and could sit, walk or stand for about twenty minutes at one time.  *Id.* at 48.

According to Plaintiff, he had constant pain in his leg that felt like "[t]otal numbness."  (Doc. 10-3 at 48).  He explained the pain was like "if your arm went totally asleep and the little needles and numbness that you get."  *Id.* at 49.  On a scale of one to ten, with ten being the worst level of pain, Plaintiff described the pain as "about eight" with medication.  *Id.*  He reported that he would lie down or sit in a reclined position "to relieve some of the numbness" for approximately four hours a day.  *Id.* at 50.  In addition, Plaintiff said he had a similar "numbness in [his] fingers" and was unable to grip or use his hands more than 15 minutes.  *Id.* at 51-52.

Vocational expert Susan Moranda testified at the second hearing.  She identified Plaintiff's past work as auto assembler, *DOT* 806.684-010; construction worker II, *DOT* 869.687-026; and in-home health care provider, *DOT* 354.377-014.  (Doc. 10-3 at 54).

The ALJ asked Ms. Moranda to consider "a person the claimants age which is 43 with an 11th grade education in special ed and the same past relevant work."  (Doc. 10-3 at 55).  The ALJ stated:

> The hypothetical person can sit six hours out of an eight-hour day, can stand six hours out of an eight-hour day; can occasionally lift and carry 20 pounds/frequently lift and carry 10 pounds; additionally, the hypothetical person can only occasionally bend and stoop; … requires a sit/stand option…, has manipulative limits of feeling bilaterally to occasional and must avoid concentrated exposure to vibration; additional postural limitations of only occasionally climbing ladders, not only stooping and bending, but occasionally climbing ladders, stooping, bending, kneeling, crouching, and crawling; and has mental restrictions of the following: a fair ability to understand, remember and carryout complex and detailed job instructions; [and] a fair ability to deal with the public.

*Id.* at 55.  Given these restrictions, Ms. Moranda opined the individual would be unable to perform any of Plaintiff's past work.  *Id.* at 56.  Ms. Moranda explained the restrictions were "very limiting… both exertionally and nonexertionally" but there were jobs available for such a person.  *Id.*  As examples, she identified the light, unskilled positions of mail sorter, *DOT* 322.687-22; cafeteria attendant, *DOT* 311.677-010; and cashier, *DOT* 211.462-010.  *Id.* at 56-57.  Ms. Moranda explained the number of jobs

11

available for each position would be eroded by 50% due to the sit/stand option and manipulative limitations in feeling.  *Id.*

Next, Plaintiff's counsel asked the vocational expert to consider an individual whose hand limitation included occasional "fine manipulation and grasping."  (Doc. 10-3 at 57-58).  Ms. Moranda opined the additional limitation "would completely erode those jobs … because they're unskilled and they require frequent and continuous hand usage."  *Id.* at 58.

## C.    Lay Witness Testimony

Mary Williams, Plaintiff's girlfriend, completed a third-party assessment on August 2, 2006. (Doc. 10-7 at 24).  She stated Plaintiff was able to take care of their children, cook, do laundry, and clean.  *Id.* at 25.  Ms. Williams reported Plaintiff was able to do chores for about "15 to 20 minutes, maybe two times a week."  *Id.* at 26.  According to Ms. Williams, Plaintiff could not "work, stand, bend, walk, [and] run."  *Id.* at 25.  She explained Plaintiff was unable to "stand for a long period of time" and said his back hurt if he was bending or standing.  *Id.* at 27.  Ms. Williams estimated Plaintiff was able to "lift about 50 pounds" and believed he was limited to "squatting for about 3 minutes, bending about 3 minutes, standing about 15 minutes, walking about 20 minutes, sitting about 30 minutes," "kneeling about 3 minutes, stair climbing about 2 minutes…[and] using hands about 10 to 15 minutes."  *Id.* at 29, 31.

Natisha Chandler, Plaintiff's niece, completed a third party report on August 3, 2006.  (Doc. 10-7 at 32-39).  She reported she talked with Plaintiff every day, and observed that he was able to take care of his children by cooking and doing their laundry.  *Id.* at 32-33.  Ms. Chandler noted Plaintiff had been able to work construction jobs and ride his bike for a couple of hours at a time, but was no longer able to do so.  *Id.* at 33.  In addition, she observed that Plaintiff was unable to "stand for long periods of time without hurting."  *Id.* at 34.  According to Ms. Chandler, although Plaintiff did not go out, he visited with family and friends every day.  *Id.* at 36.  She estimated Plaintiff was able to "lift about 55 pounds" and was limited to "squatting for about 5 minutes, bending about 5 minutes, standing about 20 minutes, walking about 30 minutes, sitting about 25 minutes, "[r]eaching about 15 minutes, kneeling about 5 minutes, stair climbing about 5 minutes…[and] using hands about 20 to 30 minutes."  *Id.* at 37, 39.

///

**D.      The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of December 31, 2008.  (Doc. 10-3 at 23).  At step two, the ALJ found Plaintiff's severe impairments included: "carpal tunnel syndrome status post remote bilateral release surgery, degenerative disc disease of the lumbar spine, osteoarthritis of the left knee, and organic mental disorder not otherwise specified."  *Id.*  At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing, including 1.02, 1.04 and 12.02.  *Id.* at 24.  Next, the ALJ found:

> The claimant has the residual functional capacity to perform light work as defined by 20 CFR 404.1567(b) and 416.967(b) except he must have an option to sit or stand at will.  The claimant can occasionally stoop, knee, crouch, crawl, and climb ladders, ropes or scaffolds.  He is limited to occasional feeling bilaterally and must avoid concentrated exposure to vibration in the work place.  Additionally, the claimant has a fair ability to perform complex and detailed tasks and a fair ability to interact with the public.

*Id.* at 25.  Based upon this residual functional capacity, the ALJ concluded "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform."  *Id.* at 31.  Consequently, the ALJ found Plaintiff was not disabled as defined by the Social Security Act.  *Id.* at 32-33.

## DISCUSSION AND ANALYSIS

Plaintiff asserts the ALJ failed to give specific and legitimate reasons for rejecting the opinions of his treating physicians, failed to give legally sufficient reasons for finding Plaintiff was not fully credible, and failed to give legally adequate reasons for rejecting the lay witness statements provided by Plaintiff's girlfriend and niece.  (Doc. 13 at 15).

**A.      The ALJ's evaluation of the medical evidence**

In this circuit, cases distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  Generally, the opinion of a treating physician is afforded the greatest weight in disability cases, but it is not binding on an ALJ in determining the existence of an impairment or on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Also, an examining physician's opinion is given more weight than the

13

opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(2).  Thus, the courts apply a hierarchy to the opinions offered by physicians.

A treating physician's opinion is not binding upon the ALJ, and may be rejected whether or not the opinion is contradicted by another.  *Magallanes*, 881 F.2d at 751.  When the opinion of a treating physician is not contradicted, an ALJ must set forth "clear and convincing" reasons to reject the opinion.  *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991).  On the other hand, an ALJ may reject the contradicted opinion of a physician with "specific and legitimate" reasons.  *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

If there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict."  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  The ALJ's resolution of the conflict must be upheld by the court when there is "more than one rational interpretation of the evidence."  *Id.*; *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

### 1.      Opinions of Dr. Kerwin

The ALJ noted she gave "little weight" to the opinions of Dr. Kerwin "as they we[re] not consistent with the conservative treatment offered by this physician and the minimal objective findings on examination and imaging studies."  (Doc. 10-3 at 29).  In addition, the ALJ noted that "Dr. Kerwin estimated the onset of disability to be over a year prior to the claimant's alleged onset date, which calls into the question the validity of his other estimates."  *Id.*  Plaintiff asserts these were not specific, legitimate reasons for rejecting Dr. Kerwin's opinions.  (Doc. 13 at 16-19).

Previously, this Court has determined, "A conservative course of treatment relative to a finding of total disability is a proper basis for discounting the extreme restrictions reported by a treating physician."  *Nicola v. Astrue*, 2010 U.S. Dist. LEXIS 42099, at *22 (E.D. Cal. April 29, 2010) (citing *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ may reject opinion of treating physician who prescribed conservative treatment yet opined that claimant was disabled).  Here, Dr. Kerwin treated Plaintiff's back and leg pain with medication.  Accordingly, the conservative treatment for these impairments supports the ALJ's decision to give little weight to the opinions of Dr. Kerwin.

14

On the other hand, however, Plaintiff received surgery for his carpal tunnel syndrome.  (*See* Doc. 10-8 at 67).  Surgery is not a routine or conservative treatment.  *Ritchotte v. Astrue*, 281 Fed. Appx. 757, 759 (9th Cir. 2008) (rejecting the ALJ's conclusion that the claimant's treatment was too conservative where he had surgery and the prognosis was guarded); *see also Walters v. Astrue*, 2010 U.S. Dist. LEXIS 55698, at *37-38 (E.D. Cal. May 10, 2010) (contrary to the ALJ's conclusion that Plaintiff received conservative treatment, "the record reflects that Plaintiff twice underwent surgery"); *Sanchez v. Colvin*, 2013 U.S. Dist. LEXIS 47081, at *10 (C.D. Cal. Mar. 29, 2013) (" surgery and conservative measures are at different ends of the treatment spectrum").  Accordingly, the treatment Plaintiff received is not a specific, legitimate reason for rejecting Dr. Kerwin's opinions regarding Plaintiff's manipulative limitations, or Plaintiff's lifting and carrying restrictions.

Moreover, the ALJ has not explained how the opinions of Dr. Kerwin are "not consistent with…the minimal objective findings on examination and imaging studies."  When an ALJ believes the treating physician's opinion is unsupported by the objective medical evidence, the ALJ has a burden to "set[] out *a detailed and thorough summary of the facts and conflicting clinical evidence*, stating his interpretation thereof, and making findings."  *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986) (emphasis added).  In this case, the ALJ failed meet this burden because she fails to identify the examination findings or imaging studies she believed to be "minimal" and in conflict with Dr. Kerwin's opinions.  Rather, the ALJ has offered only her conclusions that the medical evidence contradicted the opinions.  Therefore, the purported conflict with the medical record is not a specific, legitimate reason for rejecting Dr. Kerwin's opinions regarding Plaintiff's physical limitations.

Finally, it is unclear why the ALJ believes the difference in alleged onset dates "calls in to question the validity of [Dr. Kerwin's] other estimates."  Consequently, the Court cannot find the difference in alleged onset dates is a specific, legitimate reason for rejecting the limitations assessed by Dr. Kerwin.

### 2.	Opinions of Dr. Crews

In the evaluation of the medical evidence, the ALJ noted: "Dr. Crew's opinion is also given reduced weight because the limitations she set out are not supported by objective evidence.  Complete preclusion of all manipulative activity, for example, is inconsistent with the claimant's level of daily

15

functioning." (Doc. 10-3 at 29). Plaintiff contends the ALJ failed to properly reject the opinions of Dr. Crews (Doc. 13 at 16-19), while Defendant argues the lack of objective medical evidence and Plaintiff's activities of daily living support the ALJ's determination (Doc. 14 at 8-9).

As Defendant argues, the Ninth Circuit has determined the opinion of a treating physician may be rejected when it lacks the support of clinical findings. *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (an opinion may be rejected "if brief and conclusory in form with little in the way of clinical findings to support [its] conclusion"); SSR 96-2p, 1996 SSR LEXIS 9, at *9 (explaining the opinion of a physician is not entitled to controlling weight when it "is not well-supported by medically acceptable clinical and laboratory diagnostic techniques").[2] Here, Dr. Crews explained that her findings regarding Plaintiff's manipulative limitations were based upon Plaintiff's abnormal EMG results in both arms. (*See* Doc. 10-8 at 124). Consequently, this opinion was not without objective support from the medical record. Notably, however, Dr. Crews did not identify any objective findings regarding the postural limitations or the number of hours she believed Plaintiff was able to sit, stand, or walk in an eight-hour day. Thus, the lack of support is a specific, legitimate reason for rejecting this portion of her opinion.

A treating physician's treating physician may be rejected when the physician sets forth restrictions that "appear to be inconsistent with the level of activity that [the claimant] engaged in." *Rollins*, 261 F.3d at 856. Here, the ALJ noted Plaintiff "performs many household chores, can drive for short distances, and cares for a three year old child at home," which was inconsistent with complete preclusion of manipulative activities. (*See* Doc. 10-3 at 28). However, the ALJ did not explain how these activities are not consistent with the postural limitations or Dr. Crews' opinion that Plaintiff was required to lie down or elevate his legs for "2-3 hours" in an eight-hour day. (*See* 10-8 at 124). Therefore, Plaintiff's activities do not support the ALJ's decision to reject the opinion of Dr. Crews.

### 3.    Manipulative limitations in the RFC

After evaluating the evidence in the record, the ALJ determined Plaintiff **"**is limited to occasional feeling bilaterally and must avoid concentrated exposure to vibration in the work place."

---

[2] Social Security Rulings are issued by the Commissioner to clarify its polices and the regulations. Though they do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

(Doc. 10-3 at 25).  She found Plaintiff had no further manipulative limitations.  However, this finding is not supported by substantial evidence in the record.

Significantly, Dr. Kerwin opined Plaintiff could do "very little" pushing, pulling, reaching, pulling or grasping (Doc. 10-8 at 65) and Dr. Crews opined Plaintiff was unable to push, pull, reach, or grasp (Doc. 10-8 at 125).  Likewise, Dr. Van Kirk, an examining physician who performed an orthopedic evaluation, determined Plaintiff had manipulative limitations and could only occasionally push or pull.  (Doc. 10-8 at 102).  Because the ALJ failed to properly reject these opinions of Plaintiff's treating physicians, which are supported also by the opinion of an examining physician who determined Plaintiff's manipulative ability was impaired, the RFC determination lacks the support of substantial evidence in the record.

**B.      Lay Witness Statements**

The ALJ must consider statements of "non-medical sources" including spouses, parents, and persons in determining the severity of a claimant's symptoms.  20 C.F.R. § 404.1513(d)(4)*; see also Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to do work"). As a general rule, "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis, internal citations omitted).

To discount the testimony of a lay witness, the ALJ must give specific, germane reasons for rejecting the opinion of the witness. *Dodrill*, 12 F.3d at 919.  Here, however, the ALJ stated only that the reports of Natisha Chandler and Mary Williams "generally corroborate the claimant's allegations" and "ha[d] been taken into consideration."  (Doc. 10-3 at 26).  By failing to address the lay witness testimony, which included observations regarding Plaintiff's limited use of his hands, similar to those of the physicians, the ALJ offered no insight regarding her rejection of this evidence. The district court cannot review evidentiary findings that the ALJ failed to make, and her failure to discuss this evidence cannot be considered a harmless error.  *See Stout*, 454 F.3d at 1056.

**C.      Plaintiff's Credibility**

In assessing credibility, an ALJ must determine first whether objective medical evidence shows

an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Where the objective medical evidence shows an underlying impairment, and there is no affirmative evidence of a claimant's malingering, an "adverse credibility finding must be based on clear and convincing reasons." *Id.* at 1036; *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).  Here, the ALJ determined Plaintiff's "medically-determinable impairments could reasonably be expected to cause the alleged symptoms."  (Doc. 10-3 at 28).  However, the ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible . . ." *Id.*  Consequently, the ALJ was required to set forth clear and convincing reasons for rejecting Plaintiff's testimony regarding his limitations.

Factors that may be considered in the credibility analysis include: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  Here, the ALJ considered a number of factors, including Plaintiff's daily activities, the treatment he received, and the objective medical record.  (Doc. 10-3 at 28).  Plaintiff asserts these reasons were legally insufficient to support a rejection of his testimony.  (Doc. 13 at 20-22).

### 1.    Activities of daily living

When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Fair*, 885 F.2d at 603).  For example, a claimant's ability to cook, clean, do laundry and manage finances may be sufficient to support an adverse finding find of credibility.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Burch v. Barchart,* 400 F.3d 676, 681 (9th Cir. 2005) (the claimant's activities "suggest she is quite functional. She is able to care for her own personal needs, cook, clean and shop. She interacts with her

nephew and boyfriend. She is able to manage her own finances…"). Likewise, an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant exercises, gardens, and participates in community activities. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009). However, an ALJ must make a specific finding relating to the transferability of the activities to a workplace to refute a plaintiff's allegations of disability. *Orn*, 495 F.3d at 639.

In this case, the ALJ considered Plaintiff's activities—which included chores such as preparing basic meals and doing laundry—and concluded his activities were inconsistent with his complaints of completely disabling pain. (Doc. 10-3 at 28). However, the Ninth Circuit has made clear that the mere fact a claimant engages in normal daily activities "does not in any way detract from [his] credibility as to [his] overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). The Court continued, "One does not need to be 'utterly incapacitated' in order to be disabled." *Id.* (quoting Fair, 885 F.2d at 603). Rather, an ALJ must make a determination as to whether daily activities are transferrable to a workplace. *See Orn*, 495 F.3d at 639 (the ALJ erred in failing to "meet the threshold for transferable work skills, the second ground for using daily activities in credibility determinations").

The ALJ failed to find Plaintiff's limited activities could be transferred to a work setting, or determine whether Plaintiff spent a "substantial" part of his day engaged in such activities. Moreover, the Ninth Circuit opined, "Daily household chores and grocery shopping are not activities that are easily transferable to a work environment." *Blau v. Astrue*, 263 Fed. App'x 635, 637 (9th Cir. 2008). Thus, Plaintiff's activities of daily living were not clear and convincing evidence to discount his credibility. *See Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (limited activities did not constitute convincing evidence that the claimant could function regularly in a work setting).

2. Treatment received

In assessing Plaintiff's credibility about his symptoms, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. § 404.1529(c). Further, the treatment Plaintiff received, especially when conservative, is a legitimate consideration in a credibility finding. *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged); *see also Burch*, 400 F.3d at 681 (finding the ALJ's

1   consideration of the claimant's failure to see treatment for a three or four month period was "powerful

2   evidence" and an "ALJ is permitted to consider lack of treatment in his credibility determination).  In

3   this case, the ALJ observed "the treatment has been largely conservative in nature."  (Doc. 10-3 at 28).

4   However, as discussed above, Plaintiff received surgery to treat his carpal tunnel syndrome, which is

5   not a conservative treatment. *See Ritchotte*, 281 Fed. Appx. at 759.  Thus, this factor does not support

6   the ALJ's rejection of Plaintiff's subjective complaints concerning hand limitations.

7           3.      Objective Medical Record

8           Generally, "conflicts between a [claimant's] testimony of subjective complaints and the

9   objective medical evidence in the record" can constitute "specific and substantial reasons that

10  undermine… credibility."  *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

11  The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground

12  that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant

13  factor in determining the severity of the claimant's pain and its disabling effects."  *Rollins v.*

14  *Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch*, 400 F.3d at 681 ("Although lack of

15  medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ

16  can consider in his credibility analysis"); 1996 SSR LEXIS 4, at *2-3 (the ALJ "must consider the

17  entire case record, including the objective medical evidence" in determining credibility, but statements

18  "may not be disregarded solely because they are not substantiated by objective medical evidence").

19          Here, the ALJ did not base the decision solely on the fact that the medical record did not

20  support the degree of symptoms alleged by Plaintiff.  Thus, the objective medical evidence was a

21  relevant factor in determining Plaintiff's credibility.  However, in citing to the medical evidence as

22  part of a credibility determination, it is not sufficient for the ALJ to make a simple statement that the

23  testimony is contradicted by the record.  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001)

24  ("general findings are an insufficient basis to support an adverse credibility determination").  Rather,

25  the ALJ "must state which . . . testimony is not credible and what evidence suggests the claimants are

26  not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).

27          The ALJ noted Plaintiff's "electrodiagnostic report revealed no abnormalities in the lower

28  extremities," the "x-ray of his lumbar spine reveals only mild changes," and "[a]n MRI showed

1   degenerative changes at L5-SQ and some mild disc protrusions that do not compress any nerves."

2   (Doc. 10-3 at 28).  However, the ALJ did not address the abnormal results of the electromyography

3   and nerve conduction study that was consistent with carpal tunnel syndrome, or the alleged functional

4   limitations which are attributable to the syndrome.  Consequently, the objective medical evidence

5   offers only limited support to the ALJ's credibility determination.  *See Holohan v* 246 F.3d at 1208.

6   **D.      Remand is appropriate in this action**

7          The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to

8   order immediate payment of benefits is within the discretion of the District Court.  *Harman v. Apfel*,

9   211 F.3d 1172, 1178 (9th Cir. 2000).  Except in rare instances, when a court reverses an administrative

10  agency determination, the proper course is to remand to the agency for additional investigation or

11  explanation.  *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12,

12  16 (2002)).  Generally, an award of benefits is directed when:

13          (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence,
            (2) there are no outstanding issues that must be resolved before a determination of
14          disability can be made, and (3) it is clear from the record that the ALJ would be
            required to find the claimant disabled were such evidence credited.

15

16  *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).  In addition, an award of benefits is directed

17  when no useful purpose would be served by further administrative proceedings, or where the record has

18  been fully developed.  *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

19          Applying the *Smolen* factors to this case, the ALJ failed to set forth legally sufficient reasons to

20  properly reject the opinions of Plaintiff's treating physicians.  These opinions are intertwined with RFC

21  determination of the ALJ and the testimony of the vocational expert regarding Plaintiff's ability to

22  perform work in the national economy.  Further, the ALJ failed to properly reject the reports of the lay

23  witnesses and Plaintiff's subjective complaints.  A remand for further proceedings regarding the

24  credibility determination is appropriate remedy.  *See, e.g., Bunnell*, 947 F.2d at 348 (affirming the

25  district court's order remanding for further proceedings where the ALJ failed to explain with sufficient

26  specificity the basis for rejecting the claimant's testimony); *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th

27  Cir. 1995) (remanding the case "for further proceedings evaluating the credibility of [the claimant's]

28  subjective complaints . . .").  Based upon the record, remand is appropriate in this matter.

**CONCLUSION AND ORDER**

For the reasons set forth above, the Court finds the ALJ erred in assessing the opinions of Plaintiff's treating physicians, Drs. Kerwin and Crews.  In addition, the ALJ failed to discuss the lay witness reports, or set forth clear and convincing reasons for rejecting Plaintiff's subjective complaints. Because the ALJ failed to apply the correct legal standards, the administrative decision should not be upheld by the Court.  *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1.      Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is **REMANDED** for further proceedings consistent with this decision; and

2.      The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Roger Bingle and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **October 18, 2013**                    _____**/s/ Jennifer L. Thurston**
                                        UNITED STATES MAGISTRATE JUDGE

22